# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RUSSELL EVANS AND VICTORIA HILBUN, on behalf of the ESTATE OF JOYCE EVANS and all others similarly situated, | ) ) ) ) ) | CASE NO. |
|  | ) | JURY TRIAL DEMANDED |
| Plaintiff, | ) ) |  |
| v. | ) | CLASS ACTION COMPLAINT |
|  | ) |  |
| UNITED STATES OF AMERICA SOCIAL SECURITY ADMINISTRATION, | ) ) ) ) |  |
| Defendant. |  |  |

## I.    PRELIMINARY STATEMENT

According to its very own admissions, the Social Security Administration ("SSA") has misreported tens of thousands of living Americans as deceased due to no fault of their own.  The origin of this inexcusable and avoidable practice arises from SSA's "Death Master File", a compilation of death records that SSA owns, administrates and provides to a wide array of public and private entities on both a batch basis as well as in response to individualized inquiries, many of whom for a fee.  SSA's misreporting has devastating consequences on the living consumers who are the subject of it as it triggers a cascade of severely adverse effects, including termination of benefits, cancellation of medical insurance and coverage, revocation and acceleration of loans and credit, and closure of bank accounts, among many other types of economic harm, not to mention the physical and emotional toll on the innocent consumers.  When SSA misreports a living consumer as deceased, the subject consumers become instantly financially paralyzed as they lose access to all of their rights and benefits.  They in fact die in the financial world.

SSA's lack of reasonable procedures to assure the accuracy of the death records it sells is the cause of its egregious misreporting. If SSA required death certificates, complete matches of consumer personal identifying information (PII) and exercised reasonable care *before* reporting someone as deceased, the problem would end overnight. But because SSA believes that its error rate is low enough to be acceptable, it does nothing to ameliorate its misreporting problem that will continue to hurt thousands of individuals every year.   This case seeks to end that problem.

SSA compounds its misreporting problem, by failing to promptly correct its records after consumers dispute the error, causing consumers to endure more weeks and months of loss of benefits, lost coverage, lack of access to funds and credit and other suffering.

This consumer protection class action asserts that Defendant's practice of misreporting living consumers as deceased, as more fully set forth below, systemically and routinely violates the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 – 1681x ("FCRA") and the Privacy Act of 1974 ("Privacy Act"), and seeks recovery for the thousands of other consumers who have been harmed by SSA's practice in misreporting living consumers as deceased.

Plaintiffs Russell Evans and Victoria Hilbun, on behalf of the Estate of Joyce Evans and all others similarly situated, file this Class Action Complaint against Defendant the Social Security Administration of the United States of America ("SSA" or "Defendant"). Plaintiffs allege, based on personal knowledge as to Defendant's actions and upon information and belief as to all other matters, as follows:

## II.    <u>NATURE OF THE CASE</u>

1.    This is a consumer class action based upon Defendant's widespread violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA") and the Privacy Act of 1974, 5 U.S.C.A. §§ 552a *et seq.* ("Privacy Act").

### III.    PARTIES

2.    Decedent Plaintiff Joyce Evans was a "consumer" as protected and governed by the FCRA, who at the time of her death and the events leading to the instant action resided at 1701 Marley Avenue, Glen Burnie, Maryland 21060-6729.

3.    Plaintiffs Russell Evans and Victoria Hilbun are the co-executors of the Estate of Joyce Evans.

4.    Defendant Social Security Administration ("SSA") is a government agency headquartered in Baltimore, Maryland, and has ten regional offices and 1300 local offices nationwide. As described more fully below, Defendant is a "person" as defined in 15 U.S.C. § 1681a(b), a "consumer reporting agency" ("CRA") as defined by 15 U.S.C. § 1681a(f) and an "agency" as defined by 5 U.S.C.A. §552a(a)(1).  Moreover, the death records that SSA publishes to third parties constitute "consumer reports" as defined at FCRA section 1681a(f) and "records" as defined at section 552a(a)(4) of the Privacy Act.

### IV.    JURISDICTION & VENUE

5.    The Court has federal question jurisdiction under the FCRA, 15 U.S.C. § 1681p, 5 U.S.C.A § 552a(g)(1), and 28 U.S.C. § 1331.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events and omissions giving rise to the instant action occurred in the District of Maryland.

7.    Further, venue is proper pursuant to 5 U.S.C.A. § 552a(g)(1)(5) because both the Plaintiffs and Defendant reside in this district.

### V.    FACTUAL ALLEGATIONS

#### A.    Applicable Law

8.    The FCRA is intended "to protect consumers from the transmission of inaccurate information about them, and to establish [consumer] reporting practices that utilize accurate,

relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010).

9.      The FCRA requires that CRAs "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

10.     If a consumer disputes "the completeness or accuracy of any item of information contained in [his or her] file at a [CRA]," the FCRA requires the CRA to take several affirmative steps. *See* 15 U.S.C. § 1681i(a)(1)(A). Relevant here, the CRA that receives the consumer's dispute must "provide notification of the dispute to [the furnisher] who provided any item of information in dispute" [to the CRA], "include all relevant information regarding the dispute that the [CRA] has received from the consumer[.]" and "conduct a reinvestigation to determine if the disputed information is verifiably accurate, and if not, to delete it from the consumer's file within 30 days of receiving the dispute. 15 U.S.C. § 1681i(a)(2).

11.     The FCRA defines a consumer reporting agency as: "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

12.     "Consumer report" is defined by the FCRA as: "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the

4

purpose of serving as a factor in establishing the consumer's eligibility for . . . [credit, employment, insurance, licenses or benefits granted by a government instrumentality]." 15 U.S.C. § 1681a(d) (emphasis added).

13.      The FCRA effects a clear waiver of sovereign immunity, and thus, a consumer may sue the federal government or an agency of it for violating its terms.  *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024).

14.      The Privacy Act was passed "to protect the privacy of individuals identified in [federal] information systems," 88 Stat.6,…[and] addresses the government's retention and disclosure of personal information, *see* 5 U.S.C. §552a, including the disclosure of that information to consumer reporting agencies, *see* 31 U.S.C. §3711(e).  If a federal agency supplies inaccurate information, the Privacy Act allows individuals to seek a court order requiring it to correct its records.  *See* 5 U.S.C. §§ a(g)(1)-(2).  Money damages are also sometimes available. §552a(g)(4)." *Kirtz*, 601 at 63.

**B.    SSA's Activities in Reporting Death Records to Third Party Benefits-Providers, Lenders, Employers, Credit Reporting Agencies and other Private Entities for Eligibility Purposes, and Collecting Fees for Subscriptions to the Death Master File, Subject it to Coverage as a CRA Under the FCRA**

15.      SSA provides well-known services ranging from retirement, disability, and survivors benefits to consumers within the United States.

16.      Outside of the administration of benefits, another key function of the Social Security Administration is the ownership and maintenance of the Death Master File ("DMF") and Limited Access Death Master File ("LAMDF") database.

17.      The Death Master File contains "over 83 million records of deaths that have been reported to SSA. This file includes the following information on each decedent, if the data are

available to the SSA: social security number, name, date of birth, and date of death." Limited Access Death Master File *available at* https://dmf.ntis.gov/ (last accessed March 18, 2025).

18.    The DMF includes consumer information, such as "names, Social Security numbers, dates of birth, dates of death, and last known addresses of individuals." *Overview of Death Master File Certification (DMF),* May 29, 2024, 360ADVANCED *available at* https://360advanced.com/overview-of-the-death-master-file-dmf-certification/    (last accessed March 18, 2025).

19.    A record of a consumer's social security number, name, date of birth and date of death bears directly on a consumer's "credit worthiness", "credit capacity", "personal characteristics" and "mode of living."   15 U.S.C. §1681a(d)(1).

20.    The DMF comprises data from deaths reported to the SSA by various sources, including, *inter alia,* financial institutions, federal agencies, hospitals, and funeral homes. *See* Certification Program for Access to the Death Master File, 79 Fed Reg, 11736 (March 3, 2014), *available at*   https://www.federalregister.gov/documents/2014/03/03/2014-04584/certification-program-for-access-to-the-death-master-file (last accessed March 18, 2025).   Such entities thus meet the definition of "furnishers" under the FCRA. 15 U.S.C. §1681s-2(b).

## C.    The SSA's DMF is Used by Credit Bureaus and other Financial Institutions to Determine Eligibility for Benefits

21.    "The Death Master File is an important tool which has been used for many purposes. It is used by pension funds, insurance organizations, Federal, State and Local government entities and others responsible for verifying deceased person(s) in support of fulfillment of benefits to their beneficiaries. By methodically running financial, credit, payment and other applications against the Death Master File, the financial community, insurance companies, security firms and State and Local governments are better able to identify and prevent

6

identity fraud, and identify customers who are deceased." Certification Program for Access to the
Death Master File, 79 Fed Reg, 11736 (March 3, 2014), *available at*
https://www.federalregister.gov/documents/2014/03/03/2014-04584/certification-program-for-
access-to-the-death-master-file (last accessed March 18, 2025).

22.    "The SSA Death Master File is used by leading financial and credit firms as well
as government agencies to match records and prevent identity fraud….By methodically running
financial, credit, and other applications against the Death Master File." Limited Access Death
Master File, U.S. DEPARTMENT OF COMMERCE NATIONAL TECHNICAL INFORMATION SERVICE,
available at https://dmf.ntis.gov/ (last accessed March 18, 2025).

23.    The Social Security Administration "provide[s] the Department of Commerce's
National Technical Information Service (NTIS) a **public file of death information**,
which excludes state death records.  At the direction of SSA, NTIS sells the public file of death
information, also known as the public Death Master File (DMF) or Limited Access DMF, to other
agencies and private organizations such as banks and credit companies in accordance with the
requirements of section 203 of the Bipartisan Budget Act of 2013." *Requesting SSA's Death
Information*, SOCIAL SECURITY ADMINISTRATION, *available at*
https://www.ssa.gov/dataexchange/request_dmf.html (last visited March 10, 2025).

24.    The death records SSA supplies to its customers are used specifically for the
purpose to alert creditors as to whether a consumer is deceased such that he or she would no longer
be eligible for benefits, credit, access to bank accounts, and insurance.  The death record is used
to terminate all benefits and privileges, including the closure of bank and credit accounts and the
termination of insurance coverage, including medical insurance.  The purpose of publishing SSA's

death records is specifically to determine whether the subject consumer remains eligible for the items set forth in FCRA section 1681a(d)(1).

**D.**     **The SSA Sells Information from the DMF**

25.     The Social Security Administration "makes the Death Master File public through an agreement with the NTIS…DMF subscribers have the option of subscribing to an online search application or maintaining a raw data version of the file at their location." Certification Program for Access to the Death Master File, 79 Fed Reg, 11736 (March 3, 2014), *available at* https://www.federalregister.gov/documents/2014/03/03/2014-04584/certification-program-for-access-to-the-death-master-file (last accessed March 18, 2025).

26.     In order to receive access to the Limited Access Death Master File, an entity must be certified. *Limited Access Death Master File*, U.S. DEPARTMENT OF COMMERCE NATIONAL TECHNICAL INFORMATION SERVICE, *available at* https://dmf.ntis.gov/ (last accessed March 18, 2025).

27.     The certification program through the National Technical Information Service ("NTIS") allows certified persons (subscribers) to access the Limited Access Death Master File ("LAMDF") if they have "a legitimate fraud prevention interest, or have a legitimate business purpose pursuant to a law, governmental rule, regulation, or fiduciary duty in order to be certified under the program." *Limited Access Death Master File*, U.S. DEPARTMENT OF COMMERCE NATIONAL TECHNICAL INFORMATION SERVICE, *available at* https://dmf.ntis.gov/ (last accessed March 18, 2025).

28.     Notwithstanding the role of NTIS, SSA remains at all times the "database owner for the LAMDF." *Limited Access Death Master File*, U.S. DEPARTMENT OF COMMERCE NATIONAL

TECHNICAL INFORMATION SERVICE, *available at* https://dmf.ntis.gov/ (last accessed March 18, 2025).

29.    Through Section 203 of the Bipartisan Budget Act of 2013, NTIS charges fees "sufficient to cover the costs associated with the certification program." *Limited Access Death Master File*, U.S. DEPARTMENT OF COMMERCE NATIONAL TECHNICAL INFORMATION SERVICE, *available at* https://dmf.ntis.gov/ (last accessed March 18, 2025).

30.    Certification costs $2,930.00 annually. *See Limited Access Death Master File (LADMF) Subscriber Certification Attestation Form Processing Fee,* U.S. DEPARTMENT OF COMMERCE NATIONAL TECHNICAL INFORMATION SERVICE, *available at* https://ladmf.ntis.gov/Products/Product?productID=14 (last accessed March 18, 2025).).

31.    This certification "offers enhanced credibility, improved fraud prevention, regulatory compliance, and access to valuable data." *Overview of Death Master File Certification (DMF)* (May 29, 2024), 360ADVANCED, *available at* https://360advanced.com/overview-of-the-death-master-file-dmf-certification/ (last accessed March 18, 2025).

32.    Certified persons with access to the LADMF must still comply with relevant laws and regulations, including, *inter alia*, **the FCRA**. *See Overview of Death Master File Certification (DMF)* (May 29, 2024), 360ADVANCED, *available at* https://360advanced.com/overview-of-the-death-master-file-dmf-certification/ (last accessed March 18, 2025)(emphasis added).  As such, SSA knows that the DMF and the death records it publishes will be used for FCRA consumer report purposes, and as such it constitutes consumer report information regulated by the FCRA. 15 U.S.C. §1681a(d)(1)(defining consumer report as "information…which is *used or expected to be used or collected in whole or in part* for the purpose of serving as a factor in establishing the consumer's eligibility for…")(emphasis added).

33.     Moreover, "organizations must confirm their eligibility for DMF certification by providing detailed documentation outlining their purpose for using DMF data, internal data security measures, and compliance with relevant regulations." *Overview of Death Master File Certification (DMF)* (May 29, 2024), 360ADVANCED, *available at* https://360advanced.com/overview-of-the-death-master-file-dmf-certification/ (last accessed March 18, 2025).

**E.     Defendant's Practices Regarding the DMF and Death Records it Publishes**

34.     Defendant does not request or require a death certificate from any of its data sources which advises that a consumer is "deceased" before marking a consumer as "deceased."

35.     Defendant does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before marking that consumer as "deceased" and placing them in the public file of death information they provide to the NTIS.

36.     Defendant does not independently verify with any source that a consumer is, in fact, deceased before marking them as "deceased."

37.     Defendant employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before marking them as "deceased" and placing their information on the public file they provide to the NTIS.

38.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant employs no procedures which assure that a consumer whose information they have marked as deceased is, in fact, deceased.

39.     Nevertheless, Defendant routinely provides information to third parties that states said consumer is "deceased."

40.    Defendant does not take adequate measures to investigate or reinvestigate the status of the consumers for whom it purports to provide services.

41.    Defendant does not have any procedures in place to limit or stop the furnishing of its databases and files to third parties for consumers which it has marked as "deceased."

42.    Defendant knows that its consumers rely on its services and benefits and on its ability to accurately maintain their information.

43.    Defendant is expressly aware that consumers are improperly listed as deceased in their records. *See What should I do if I am incorrectly listed as deceased in Social Security's records,* Social Security Administration (October 7, 2022), *available at* ihttps://www.ssa.gov/faqs/en/questions/KA-02917.html#:~:text=KA%2D02917-,What%20should%20I%20do%20if%20I%20am%20incorrectly,deceased%20in%20Social%20Security's%20records%3F&text=If%20you%20suspect%20that%20you,office%20as%20soon%20as%20possible (Last accessed March 11, 2025).

**F.    SSA Knows Both that it Reports Erroneous Death Records about Thousands of Living Consumers, and the Devastating Impact such Errors have on Consumers; Yet Does Nothing to Stop the Problem**

44.    In response to numerous news articles and media investigation of the problem, SSA has acknowledged: "We can share that approximately 3.4 million deaths are reported to the Social Security Administration each year. Less than two-thirds of 1% are subsequently corrected." Tolly Taylor, *Mistaken for dead: Federal government cuts off Maryland woman from finances, health care,* WBALTV11, *available at* https://www.wbaltv.com/article/mistaken-for-dead-death-declared-social-security/60267341 (last accessed March 20, 2025).

45.    One media source quoted in the same article noted that obtained a review from the Office of the Inspector General of the Social Security Administration's death master file in 2021

that found roughly 10,000 people were mistakenly declared dead each year between 2013 and 2019. *Id*.

46.    Just recently, on March 16, 2025, SSA issued a press release in which it stated, among other things:

> Deaths are reported to Social Security primarily from the States, but also from other sources, including family members, funeral homes, Federal agencies, and financial institutions. In a 2008 audit report, the IG noted that "SSA receives most death reports from funeral homes or friends/relatives of the deceased. *SSA considers such first party death reports to be verified and immediately posts them to the Death Master File*."
>
> *Instances when a person is erroneously reported as deceased to Social Security can be devasting to the individual, spouse, and dependent children. Benefits are stopped in the short term which can cause financial hardship until fixed and benefits restored, and the process to prove an erroneous death will always seem too long and challenging.*

Mark Hinkle, *Social Security Provides Update about its Death Record*, PRESS OFFICE, SOCIAL SECURITY ADMINISTRATION (March 16, 2025) *available at* https://www.ssa.gov/news/press/releases/2025/#2025-03-16 (emphasis supplied).

47.    Thus, by its own admissions, SSA is aware of tens of thousands of consumers who it erroneously reports as deceased on an ongoing basis, and does not perform any verification of the death records it receives from its sources before positing them to the DMF, notwithstanding the knowledge of that devastating consequences that can occur.

**G.    <u>Plaintiff's Experience</u>**

48.    On December 23, 2023, Ms. Evans received a letter from the United States Office of Personnel Management ("OPM") regarding a death record that SSA had reported about her and requesting information to verify her living status in order to continue monthly payments.

49.    Prior to reporting the death record to OPM, and prior to Ms. Evans' receipt of the letter from OPM, SSA had never tried to collect any information directly from Ms. Evans herself regarding her living status in violation of Privacy Act section 552(a)(e)(2).

50.     And after decades of service as a federal government worker, Ms. Evans was cut-off from her pension by OPM after being declared deceased in their system and lost out on over $12,000 of pension payments.

51.     On December 26, 2023, Ms. Evans received a condolence letter from CompuLink regarding her death and the payoff for the sale of her house.

52.     On December 26, 2023, Ms. Evans received two letters from the Home Equity Conversion (HECM) regarding a Deed-in-Lieu and short sale information of her home.

53.     On January 9, 2024, Ms. Evans faxed the Living Status Information Form to OPM, asserting that she was alive at the time.

54.     Ms. Evans then completed a Statement of Claimant or Other Person SSA 795 Form.

55.     On January 25, 2024, Plaintiff Evans, along with her son and caretaker Michael Evans, visited an SSA office in Glen Burnie, Maryland to dispute the erroneous SSA death record.

56.     The Social Security Administration subsequently sent a letter to Ms. Evans informing her of its mistake in wrongly recording her death in their system on January 25, 2024 (the "January 25th Letter").   However, notwithstanding Plaintiff Evans' dispute, SSA never contacted the furnisher of the original erroneous death record misreporting, never permanently removed the death record from her file, and never reported the corrected record to the entities whom it had previously provided the death record.  As such, Plaintiff Evans continued to be denied her benefits.  In sum, SSA did not fix the problem notwithstanding her dispute.

57.     On the same day, and at the meeting with SSA, Ms. Evans filled out a form document provided by SSA verifying that she was alive and provided it to the clerk.

58.     On February 6, 2024, Ms. Evans received a notice from Wells Fargo that she had an overdrawn account with a statement of $443.43 and her bank account was closed, as she had been declared dead.

59.     On February 8, 2024, SSA sent another letter to Ms. Evans advising it had wrongly reported her death (the "February 8th Letter"), that it had released her personal information and offered her free enrollment in a credit monitoring service.

60.     On February 8, 2024, Ms. Evans received a letter from BlueCross/BlueShield ("BC/BS") terminating her benefits and requesting a refund for claims from that point on that BC/BS paid out.

61.     On February 21, 2024, the Anne Arundel County Water Company issued a Turnoff Notice for Ms. Evans' home because automatic payment had stopped as a result of her bank account closure. Ms. Evans subsequently paid the outstanding bill in the amount of $259.01.

62.     On February 21, 2024, Ms. Evans went to Wells Fargo to reinstate her checking account.

63.     On February 23, 2024, Wells Fargo issued a past due notice to Ms. Evans.

64.     Plaintiff Ms. Evans against visited the SSA office in Glen Burnie 2 more times in February and March to again dispute SSA's erroneous death record.  However, again, and notwithstanding Plaintiff Evans' disputes, SSA never contacted the furnisher of the original erroneous death record misreporting, never permanently removed the death record from her file, and never reported the corrected record to the entities whom it had previously provided the death record.  As such, Plaintiff Evans continued to be denied her benefits.  SSA did not fix the problem notwithstanding her dispute.

14

65.     In addition to Social Security and her bank, from the end of December through March, Evans also received letters saying she was cut off from the Internal Revenue Service, Medicare, Blue Cross Blue Shield, her credit cards and her retirement checks.

66.     This led to overdue bills from the Baltimore Washington Medical Center after Medicare denied paying for a recent procedure because she was listed as dead in their records.

67.     On March 19, 2024, OPM sent another letter to Ms. Evans stating that her case was dropped for a third time because SSA was still reporting her deceased, notwithstanding its 2 earlier letters recognizing the error and her 3 in-person disputes.

68.     The loss of her health insurance made her medications, including heart medication, completely inaccessible to Ms. Evans, and she had to borrow money and pay out-of-pocket to obtain her life-dependent medication.

69.     As a result of SSA's persistent misreporting her as deceased, Ms. Evans suffered thousands of dollars in economic injury related to her lost benefits and insurance coverage, and closure of her bank accounts.

70.     In addition, Ms. Evans expended tens, if not hundreds of hours of time disputing SSA's erroneous deceased reporting and trying to get it correct, and expended sums out-of-pocket in doing so for transportation and postage.

71.     The loss of access to available benefits, healthcare coverage, and important accounts caused significant stress and anxiety to Ms. Evans.

72.     During the time that SSA was reporting Ms. Evans as deceased, her medical condition deteriorated significantly due to the tremendous stress she endured as a result of SSA's misreporting her as decesased and the severe financial impact on her life the misreporting caused.

73.     Ms. Evans died on July 24, 2024.

74. At all times pertinent hereto, Defendant was acting by and through its agents, servants and/or employees, including NTIS, who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

75. At all times pertinent hereto, the conduct of the Defendant, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights of the Plaintiff herein.

## CLASS ACTION ALLEGATIONS

76. Plaintiff brings this action on behalf of the following Classes:

**a. The "Falsely Reported as Deceased Class"**

All persons residing in the United States and its Territories about whom Defendant published to a third party that such person was deceased during a time that they were alive and during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of the class certification.

**b. The "Economic Loss Subclass"**

All members of the Falsely Reported as Deceased Class who lost benefits, services, insurance coverage or otherwise suffered economic harm as a result of being falsely reported as deceased during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of class certification.

**c. The "Falsely Reported Admission Subclass"**

All members of the Falsely Reported as Deceased Class who were sent a letter substantially in the form of either the January 25th Letter or the February 8th Letter during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of class certification.

**d. The "FCRA Failure to Reinvestigate Subclass"**

All members of the Falsely Reported as Deceased Class who disputed their deceased status with Defendant and for whom Defendant failed to reinvestigate such dispute, notify the underlying furnisher and delete the deceased reference from their file within 30 days of receipt of the dispute.

**e. The "Privacy Act Failure to Correct Subclass"**

All members of the Falsely Reported as Deceased Class who requested amendment of a deceased record and to whom Defendant failed to acknowledge in writing receipt of such request within 10 days and/or failed to promptly correct the deceased record or notify the person of its refusal to correct the record.

77.    Plaintiff reserves the right to amend the definition of the Class based on discovery or legal developments.

78.    **Numerosity.  Fed. R. Civ. P. 23(a)(1).**  The members of the Class are so numerous that joinder of all is impractical. Upon information and belief, the number of consumers harmed by Defendant's practices are more numerous than what could be addressed by joinder, and those persons' names and addresses are identifiable through documents or other information maintained by Defendant.

79.    **Existence and Predominance of Common Questions of Law and Fact.  Fed. R. Civ. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Class, and predominate over the questions affecting only individuals.   The principal questions concern whether the Defendant willfully and/or negligently violated the FCRA and Privacy Act by falsely reporting that Class members were deceased when they were not.

80.    **Typicality.  Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of each Class Member.  Plaintiff has the same claims for relief that he seeks for absent Class Members.

81.    **Adequacy**.  **Fed. R. Civ. P. 23(a)(4).**  Plaintiffs are adequate representatives of the Classes they seek to represent because their interests are aligned with, and are not antagonistic to, the interests of the members of the Classes they seek to represent.  Further, they have retained counsel extremely experienced in both consumer class actions and FCRA litigation, and they intends to prosecute this action vigorously. FMS has been certified to serve as class counsel by federal courts all over the country on over 80 occasions and have been repeatedly commended by

the courts they appear before for the high caliber of their work. *See Barel v. Bank of America*, 255 F.R.D. 393, 398-99 (E.D. Pa. 2009) (finding FMS "competent, experienced and well-qualified to prosecute class actions" and noting that class counsel "have done an excellent job in representing the class in the instant litigation."); *Martinez v. Avantus, LLC,* 343 F.R.D. 254 2023 WL 112807, *9 (D. Conn. Jan. 5, 2023)(firm "has substantial experience in class action litigation, including FCRA class actions….[and] demonstrated proficiency at all stages of suit"); *Ramirez v. Trans Union, LLC*, 2022 WL 17722395 (N.D. Cal. Dec. 15, 2022)("Courts have consistently recognized Francis Mailman Soumilas 'for its expertise in FCRA litigation and the high caliber of its work for the classes it represents.'"); *Der Hacopian v. SentryLink*, C.A. 18-3001 (D. Md., Nov. 23, 2020)(firm "many, many times in the past has been found to be not just qualified or competent, but extremely well-qualified and competent to represent consumer classes in many, many other jurisdictions, not only this particular jurisdiction"); *Flores v. Express Services, Inc.*, C.A. No.14-3298, 2017 WL 1177098, at *3 (E.D. Pa. March 30, 2017) (firm "has extensive experience in consumer class action litigation); *White v. Equifax Info. Solutions*, No. 05-01070, 2014 WL 1716154, at *13, 19, 22 (C.D. Cal. May 1, 2014), *aff'd sub nom. Radcliffe v. Equifax Info. Sol'ns., Inc.*, 818 F.3d 537, 548 (9th Cir. 2016) (appointing firm and its team as interim class counsel over objections from a competing national law firm (Boies Schiller) because firm's team's "credentials and experience [we]re significantly stronger in class action and FCRA litigation."); *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 307 (N.D. Cal. 2015) (FMS "have represented consumer classes in many cases in many districts . . . [and] have shown their proficiency in this case[.]"); *Kelly v. Business Information Group*, C.A. 15-6668, 2019 WL 414915 (E.D. Pa. 2019) (firm "qualified and experienced attorneys" … Francis & Mailman, P.C., of Philadelphia…who have substantial experience in class action and FCRA consumer litigation and who are qualified to conduct the

litigation."). Plaintiff and his counsel will fairly and adequately protect the interests of members of the Class.

82.     **Predominance and Superiority.  Fed. R. Civ. P. 23(b)(3).**  Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

**COUNT I**
**(CLASS CLAIM)**
**15  U.S.C. § 1681e(b)**

83.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length here.

84.     Pursuant to section 1681n and/or 1681o of the FCRA, Defendant is liable for violating the FCRA with respect to Plaintiffs and the Class by failing to follow reasonable procedures to assure "maximum possible accuracy" of the reports it sold, in violation of 15 U.S.C. § 1681e(b).

**COUNT II**
**(CLASS CLAIM)**
**15 U.S.C. § 1681i**

85.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length here.

86.     Pursuant to sections 1681n and 1681o of the FCRA, Defendant is liable for negligently and willfully failing to conduct reasonable reinvestigations of the erroneous deceased record that Plaintiff Evans disputed on multiple occasions, failing to contact the furnisher(s) who originally reported such information, failing provide Plaintiff with reinvestigation results and failing to correct its records and Plaintiff's file within 30 days of dispute.

**COUNT III**
**5   U.S.C. § 552a(g)(1)(c) and § 552a(g)(1)(d)**

87.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length here.

88.     According to 5 U.S.C.A. § 552a(a)(4), "the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."

89.     The death record that SSA reported about Plaintiff Evans constituted a "record" under the Privacy Act.

90.     The Privacy Act of 1974 provides for an individual's ability to request an amendment of a record pertaining to them from relevant agencies and requires that those agencies,

"(A) not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request, acknowledge in writing such receipt; and
(B) promptly, either—
(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or
(ii) inform the individual of its refusal to amend the record in accordance with his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official."

U.S.C.A. § 552a(d)(2)

91.     The Privacy Act requires that agencies that maintain systems of records "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs" (5 U.S.C.A. § 552a(e)(2)); "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination" (5 U.S.C.A. § 552a(e)(5)); and " prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." 5 U.S.C.A. § 552a(e)(6).

92.     The Privacy Act of 1974 allows for a consumer to bring a claim against an agency whenever said agency "makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection" (5 U.S.C.A. § 552a(g)(1)(A)) or, "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual." 5 U.S.C.A. § 552a(g)(1)(C).

93.    Plaintiff brings claims pursuant to §552a(g)(1)(C) and § 552a(g)(1)(D) for Defendant's intentional, willful and reckless conduct as follows:

- Failing to collect information to the greatest extent practicable directly from the subject individual as is relevant and necessary to accomplish a purpose of the agency required to accomplished by statute or by executive order of the President in violation of Privacy Act section 552a(e)(2);
- Failing to maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance , timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination in violation of Privacy Act section 552a(e)(5);
- Failing to: prior to disseminating any record about an individual to any person other than an agency…make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes in violation of Privacy Act section 552a(e)(6);
- Failing to correct the erroneous death record about Plaintiff Evan from its system within 10 days of her dispute; and
- Failing to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual in violation of Privacy Act section 552a(g)(1)(C)

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for relief as follows:

a.  An order certifying the case as a class action on behalf of the proposed Class under Federal Rule of Civil Procedure 23 and appointing Plaintiff and the undersigned counsel of record to represent same;

b.  Injunctive relief requiring that SSA verify the accuracy of the death records it publishes prior to reporting them, and in compliance with the FCRA and Privacy Act;

c.  Declaratory relief that SSA's practices violate the FCRA and Privacy Act;

d.  An award of actual, statutory and punitive damages for Plaintiff and the Class under the FCRA and Privacy;

e.  An award of pre-judgment and post-judgment interest as provided by law;

f.  An award of attorney's fees and costs pursuant to section 1681n and/or 1681of the FCRA and 5 U.S.C.A. § 552a(g)(2)(B); and

g.  Such other relief as the Court deems just and proper.

## TRIAL BY JURY

Plaintiff hereby requests a trial by jury on those causes of action where a trial by jury is allowed by law.

RESPECTFULLY SUBMITTED

**Schlachman, Belsky, Weiner, & Davey, P.A.**

BY */s/ Sarah L. Smith*

Sarah L. Smith, Esquire
300 East Lombard Street, Suite 1100
Baltimore, MD 21202-3245
E: ssmith@sbwdlaw.com
(410) 685-2022

James A. Francis*
E: jfrancis@consumerlawfirm.com
John Soumilas*
E: jsoumilas@consumerlawfirm.com
Lauren KW Brennan *
E: lbrennan@consumerlawfirm.com
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
T: 215.735.8600
F: 215.940.8000

*Pro hac vice* applications forthcoming

*Attorneys for Plaintiff*